231 So.2d 923

**E. W. VEASEY, alias**

**v.**

**STATE.**

**4 Div. 23.**

Court of Criminal Appeals of Alabama.

Feb. 24, 1970.

**470**

Lewis V. Chesser, Andalusia, for appellant.

MacDonald Gallion, Atty. Gen., and Herbert H. Henry, Asst. Atty. Gen., for the State.

CATES, Judge.

Forgery first degree; sentence three years in the penitentiary. Code 1940, T. 14, § 199 (check on a national bank)

I

Mr. Max Barton, a grocer in Andalusia, to whom Veasey passed false check testified in chief:

"Q Now, if you would, tell us just what transpired between you and Eddie Veasey down there at your store that night?

"A Eddie came in the store and he asked the lady in the front at the register about cashing a check for him, and the lady wouldn't cash it because it was a personal check until I approved it. So Eddie came on back to the market where I was working and laid the check up on the counter, and I looked at the check and I told him then I didn't know him personally, but I did say I know Mr. A. B. Clayton.

"Q Now just a minute before we get into that. I show you here this check and I ask you to take a look at it, if you would, and ask you if you can identify it for us?

"A It's the same check.

"Q Now is it a check on a bank?

"A It's on the First National Bank of Dozier.

"Q What is the date of that check?

"A April 30, 1968.

"Q What is the amount of the check?

"A $48.50.

"Q And what signature appears on the face of the check?

"A A. B. Clayton.

"Q Now is that the same check that Eddie Veasey showed you and gave you that night?

"A That's right.

"We would like to have it marked for identification, please.

"WHEREUPON, said check is marked as State's Exhibit 1 for identification.

"Q Now, Mr. Barton, you were beginning to tell us what transpired between you and Mr. Veasey about this check?

"A Well, after I told Eddie that I didn't know him personally but I did know Mr. A. B. Clayton, and I asked him if he had been doing some work for Mr. Clayton.

"Q What did he say?

"A He said he had been fixing some fence and cleaning out a chicken house, and I told him I would cash the check for him.

"Q He said he had been fixing some fence and cleaning out a chicken house for Mr. Clayton?

"A Right.

"Q Then what happened?

"A So he bought between two and three dollars worth of groceries. I went back up front to the register and run the groceries up and cashed the check for him.

"Q Now how much was the amount for his groceries?

"A I don't remember exactly, but between two and three dollars.

"Q A small amount for which he got groceries, right?

"A Right.

"Q What about the balance of the check, what happened?

"A I gave him cash for it.

"Q Now to whom is this check made payable?

"A To E. W. Veasey.

"Q Now, did he endorse this check in your presence?

"A He did.

"Q Does that endorsement appear on the back?

"A It does.

"Q How does it read?

"A E. W. Veasey.

"Q What did you do with the check after you had it?

"A That was on Wednesday night, and the bank, of course, closed on Thursday. Friday morning I taken all the checks I had, including this one, to The Commercial Bank in Andalusia and cashed them for money in order that I would be able to cash more checks that day, which is a regular routine on Friday.

"Q You did not deposit these, you cashed them?

"A Right.

"Q Then what happened?

"A And on up in the morning—oh, it was around 9:00 or 9:30 then, and when I got back to my business Jack Floyd, Mr. A. B. Clayton's son-in-law, was at the store. He works for the employment service and a lot of mornings when he gets a break he comes down and gets some cookies and drinks some milk. I mentioned to Jack if Mr. Clayton had some work done up there, and he said he didn't. And I told him then that I had cashed a check on A. B. Clayton. He said, 'Max, I can't figure why Mr. Clayton would be giving a check.' So I asked Jack would he go by the Commercial Bank and ask Mrs. Wilson if she would hold this check out and let Jack look at it and see if he thought that was Mr. A. B. Clayton's signature. And Jack * * *

"Q Don't tell what Jack thought or said. Just tell what you did in regard to the check?

"A All right, I went back to the bank and picked the check up.

"Q And what did you do with it then?

"A I went to hunting E. W. Veasey.

"Q Did you find him?

"A I did.

"Q You called him E. W. Veasey right now, and awhile ago you called him Eddie Veasey. Is that one and the same person you are referring to?

"A That's right, the same person.

"Q That person at the table?

"A  That's right. Can I tell where I found him?

"Q  Yes.

"A  He was down at Bob Adkinson's Oyster Bar drinking beer. I called him outside.

"Q  Did you talk to him about the check?

"A  I certainly did.

"Q  Was there any police officer or law enforcement officer with you?

"A  No, sir.

"Q  Did you just call him outside to discuss the matter with him?

"A  Right.

"Q  Did you make any threat to him to tell you about it?

"A  I told him that I had a check that * * *

"Q  Wait just a minute. What I want to know, did you threaten him in any way about this thing, do him any harm or anything?

"A  The only thing I told him was that it was 11:00 o'clock then and I told him if he didn't get my money up by dinner, by 12 o'clock, that I was going to put him in jail.

"Q  That's what you told him?

"A  That's what I told him, after I called him outside.

"Q  Now, did you see him again that day?

"A  No, I didn't.

"Q  Then what did you do in regard to the check?

"A  Well, to begin with I came up to Ray Bozeman's office, and, of course, that's when I found out how stupid I was. I didn't realize I had to go to Dozier to have the check verified before I went and swore out a warrant for him.

"Q  Did you go to Dozier?

"A  Yes, sir.

"Q  Did you go to The First National Bank of Dozier?

"A  Yes, sir.

"Q  Did you offer the check for payment there?

"A  Right.

"Q  Was it accepted?

"A  No sir.

"Q  Now after that did you see Mr. Veasey again?

"A  No, sir, not before we met for a hearing in Judge Colquett's court.

"Q  The check that you hold in your hand, is that the same check that Eddie Veasey gave you?

"A  Right.

"Q  Is it the same check that you offered for payment at the First National Bank of Dozier?

"A  Right.

"Q  Has it been altered in any way that you can tell from the way it was when you first took it from Eddie Veasey?

"A  The only thing is what the bank has written on the back of it.

"Q  Now did you place your endorsement on this check?

"A  I did."

A. B. Clayton, the purported maker of the check was a witness for the State:

"Q  Is that your signature?

"A  No, sir.

"Q Did you authorize anyone to write that check?

"A I did not."

The defendant braved a penitentiary record which gapped his credibility. Taking the stand in his own behalf, he gave the following to explain the check:

"Q Tell the jury how you got this check right here?

"A Well, I have done told you, me and Comer Short had been drinking that day. We run out of money, and Comer said, here, take this check and pulled it out of his pocket, and go get it cashed, and come back by the liquor store and get some whiskey. Well, I went down to Mr. Barton's and got the check cashed. We come back by the liquor store and got six fifths of whiskey. I kept a fifth of it and give Comer Short the rest of it, and he carried me to the house. And later on Comer was picked up over in Opp and brought to the County jail there where I was.

"Q You didn't see anybody write this check or anything else, did you?

"A No, sir, I sure didn't."

## II

In brief, the Attorney General quite pertinently argues:

"'Appellant in brief contends that he was 'deprived of utilizing an apparently valid defense, namely, the testimony of the person [we interpolate: Comer Short] who allegedly gave him this check in question and asked him to cash it.'

"'Appellee submits that this contention cannot be the basis of appeal. There is no indication in the record that the witness was subpoenaed by either the State or the defense. There being no ruling of the Court to which error could be attached, appellee submits that this contention is not before this Court for consideration.'"

For authority, if any is needed, to support the State's submission we quote from Ex parte Craft, 41 Ala.App. 519, 138 So. 2d 266:

"Dr. Eddins was not shown to have been subpoenaed by the defense. Our Constitution, § 6, calls for compulsory process. Failing to ask for such process is a waiver of it. Johnson v. Williams, 244 Ala. 391, 13 So.2d 683. * * *"

And again from Forrester v. State, 41 Ala. App. 654, 148 So.2d 251:

"Compulsory process for a witness is not shown to have been denied without a record showing (1) a subpoena (or attachment) was timely asked, and (2) the witness is within the court's jurisdiction. Code 1940, T. 15, § 290 (clerk issues subpoenas on application); Parsons v. State, 251 Ala. 467, 38 So.2d 209; Walker v. State, 117 Ala. 85, 23 So. 670; Sanders v. State, 181 Ala. 35, 61 So. 336; Brown v. State, 247 Ala. 288, 24 So.2d 223; Adams v. State, 33 Ala.App. 136, 31 So.2d 99; Scott v. State, 34 Ala.App. 519, 41 So.2d 630; Clark v. State, 36 Ala.App. 159, 57 So.2d 375; Powell v. State, 39 Ala.App. 246, 100 So.2d 38; Cranmore v. State, [41 Ala.App. 421], 129 So.2d 121; Ex parte Craft, [41 Ala. App. 519], 138 So.2d 266. See Orfield, Subpoena in Federal Criminal Procedure, 13 Ala.Law Rev. 1, particularly pp. 21–28 under heading 'State Cases.'" (Footnotes omitted)

We have carefully reviewed the entire record under Code 1940, T. 15, § 389 and consider the judgment below is due to be

Affirmed.